

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| KRIS THORNTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-07-S-438-NW |
| | ) | |
| PHILLIP KING, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Kris Thornton, asserts a claim, pursuant to 42 U.S.C. § 1983, for violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.[1]  He originally named the following defendants:  Phillip King, a jailer at the Lauderdale County, Alabama, detention center; Jackie Rikard, the administrator of the Lauderdale County detention center; and Ronnie Willis, the Sheriff of Lauderdale County.  All defendants were sued in

---

[1]*See* doc. no. 1 (Complaint).  Plaintiff's complaint originally invoked both the Eighth and Fourteenth Amendments.  The Eighth Amendment prohibits the cruel and unusual punishment of convicted and sentenced inmates of county jails, while the Fourteenth Amendment protects pretrial detainees.  *See, e.g., Marsh v. Butler County,* 268 F.3d 1014, 1024 n.5 (11th Cir. 2001).  At this stage of the proceedings, it is undisputed that plaintiff was a convicted inmate.  *See* doc. no. 31 (defendant's brief), at 2 (defendant's statement of fact # 1); doc. no. 34 (plaintiff's brief), at 1, ¶ 1 (plaintiff's response to defendant's alleged undisputed facts).  Accordingly, the Eighth Amendment governs plaintiff's claims.  That conclusion makes little difference to the analysis on summary judgment, however, because "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments . . . ."  *Marsh,* 268 F.3d at 1024 n.5.

their respective individual capacities only.

Plaintiff now has agreed to the dismissal of his claims against Rikard and Willis.[2]  Accordingly, only plaintiff's claim against jailor Phillip King, in his individual capacity, remains at issue.  The case currently is before the court on King's motion for summary judgment.[3]  Upon consideration of the motion, the parties' briefs, and the evidentiary submissions, the court concludes the motion should be denied.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

---

[2]*See* doc. no. 34 (plaintiff's response to defendants' motion for summary judgment), at 1 ("Thornton agrees to the dismissal of his supervisory liability claims against defendants Willis and Rikard.").

[3]Doc. no. 30.  Plaintiff did not consent to the dismissal of Rikard and Willis until *after* the motion for summary judgment originally was filed on behalf of *all* defendants.  Thus, while the motion for summary judgment actually states that it was filed on behalf of all three defendants — King, Rikard, and Willis — the court now will consider it as King's motion only.

[4] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 127 S. Ct. 1769, 1776 (2007).

## II. SUMMARY OF FACTS[5]

---

[5]Defendant failed to respond to plaintiff's statement of additional disputed facts. *See* plaintiff's brief, at 15-17 (Additional Disputed Facts in the Light Most Favorable to Thornton); *see also* doc. no. 42 (defendant's reply brief). Accordingly, all of those facts are deemed admitted. The Uniform Initial Order states the following with regard to the moving party's reply submission in summary judgment proceedings:

In March of 2005, plaintiff, Kris Thornton, was incarcerated at the Lauderdale County, Alabama detention center ("the jail").  On March 11, 2005, Thornton filed a written grievance, requesting that he be moved from his general population cell due to a conflict with one of his cell mates.[6]  Approximately twenty to thirty minutes later, defendant Phillip King, a corrections officer at the jail, entered plaintiff's cell and directed him to pack his belongings.[7]  Plaintiff expected to be moved to a different general population cell, but, instead, King took him to a "lockdown" cell, or an individual cell often used for disciplinary purposes.  The lockdown cell area is separated from the general population cells, and inmates who yell or otherwise create disturbances are often placed in lockdown to avoid further disturbing other inmates in the general population.[8]

---

      The reply submission, if any, shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts. The moving party's response to the non-moving party's additional claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the non-moving party's additional claimed undisputed facts.  Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based.  *All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*

Doc. no. 14 (Uniform Initial Order), at 18 (emphasis in original).  The court will, of course, only rely upon those alleged facts that actually are supported by the evidentiary record.

    [6]Doc. no. 32 (defendant's evidentiary submission), Tab A (Deposition of Kris Thornton), at 101-03.

    [7]*Id.* at 103.

    [8]*Id.* at 103, 111*; see also* defendant's evidentiary submission, Tab B (Deposition of Phillip

Plaintiff began beating on the window of his lockdown cell and asking why he had been placed there.[9]  Also, while plaintiff was in lockdown, he got into a verbal argument with two other inmates who also had been placed in nearby lockdown cells. The argument became heated, and the inmates began yelling at each other.[10]  King entered plaintiff's lockdown cell to investigate the cause of the argument.[11]  Plaintiff stepped back a few steps while King opened the door.  When King entered, plaintiff again asked him why he had been put in lockdown.  In a fit of rage, King ran toward plaintiff, grabbed his neck with both hands, slammed him down on the metal bunk, and beat his head against the concrete wall four to six times.  King then left plaintiff's cell and slammed the door behind him.[12]

Plaintiff testified that, after this incident, a large knot formed on the back of his head, and he got a bad headache.[13]  Plaintiff had never had nosebleeds before the incident, but has experienced sudden nosebleeds "once or twice every other month" since then.[14]  However, plaintiff received no cuts to his head, he did not lose

---

King), at 34-36, 126.

[9]Thornton Deposition, at 103.

[10]*Id.* at 115-16.

[11]King Deposition, at 42-48.

[12]Thornton Deposition, at 103-04, 122-24.

[13]*Id.* at 104-05.

[14]*Id.* at 135-36.

consciousness, and he experienced no memory loss.[15]  Soon after the incident, plaintiff informed corrections officer Jim Williams about the knot on his head. Williams felt the knot and decided to get the jail nurse, Annette McCurry, who stated that she could not feel a knot.[16]  McCurry also testified that plaintiff complained of double vision, but she did not perceive any signs of the double vision when she examined him.[17]  Even so, Dr. Duff Austin, the jail physician, testified that there are no definitive tests to detect whether a patient is experiencing double vision, and that doctors typically rely upon a patient's subjective complaints to diagnose the condition.[18]

The following day, March 12, 2005, plaintiff was sent to the Eliza Coffee Memorial Hospital Emergency Room, because he was experiencing nose bleeds and had a history of prior brain surgery.[19]  The emergency room doctors noted that plaintiff had suffered a closed head injury, and they performed CAT scans of plaintiff's brain and face.  Both were normal.  Plaintiff was prescribed Motrin and discharged.  The Motrin prescription was later withdrawn, however, due to concern

---

[15]*Id.* at 138-29.

[16]*Id.* at 104, 131-32.

[17]Defendant's evidentiary submission, Tab D (Deposition of Annette McCurry), at 89.

[18]Defendant's evidentiary submission, Tab F (Deposition of Duff Austin), at 237-38.

[19]*See* defendant's evidentiary submission, Tab E (records from Eliza Coffee Memorial Hospital); Austin Deposition, at 14, 33-34, 119.

that it would exacerbate plaintiff's nosebleeds.[20]

Dr. Austin examined plaintiff on March 14, 2005, after plaintiff returned from the emergency room.[21]  Dr. Austin did not see a bruise on the back of plaintiff's head, but the area was obscured by plaintiff's hair.[22]  However, Dr. Austin did feel a small, spongy, swollen spot on the back of plaintiff's head, which he believed to be a bruise.[23]  Dr. Austin testified that he did not see any physical evidence of plaintiff's head being banged against a wall several times, but he also acknowledged that he could not definitively state that additional symptoms would have been present if plaintiff did receive the injuries he alleges.[24]

Dr. Austin testified extensively on the likelihood that plaintiff's alleged injuries caused his nosebleeds.  Dr. Austin never examined plaintiff while his nose actually was bleeding.  His nursing staff had informed him that, as long as plaintiff's nose was packed and pressure was applied, the bleeding would stop, but that plaintiff repeatedly removed the packing, resulting in bleeds.  Based on these reports, Dr. Austin believed that the cause of plaintiff's nosebleeds was a scab within plaintiff's

---

[20]*See* defendant's evidentiary submission, Tab E (records from Eliza Coffee Memorial Hospital).

[21]Austin Deposition, at 14, 123, 129-30.

[22]*Id.* at 45, 259.

[23]*Id.* at 131.

[24]*Id.* at 260-61.

nose that had been picked.[25]  However, Dr. Austin acknowledged that no one knew

exactly when plaintiff pulled the packing out of his nose,[26] and plaintiff stated that he

removed the packing only after it became drenched with blood.[27]

Dr. Austin also testified that, in almost thirty years of emergency room work,

he had never seen a nosebleed result from injuries to the back of a patient's head.[28]

Indeed, early in his deposition, Dr. Austin concluded that it would be "impossible"

for a nosebleed to occur as a direct result of trauma to the back of a person's head,

because rear head trauma would not affect the blood vessels leading to the nose.[29]

Later, however, Dr. Austin at least partially recanted, stating that the "probability" of

plaintiff experiencing a nose bleed as a result of the injuries he allegedly received to

the back of his head was "zero," but that it was not "impossible."[30]  He did not

explain the difference between "zero probability" and "impossibility."  Dr. Austin did

acknowledge other injuries or conditions that *could* cause a nosebleed, including an

increase in blood pressure or severe trauma to a person's face.[31]  According to records

from plaintiff's emergency room visit, plaintiff reported facial tenderness and had "a

---

[25]*Id.* at 27-28.  *See also* McCurry Deposition, at 90.

[26]Austin Deposition, at 27.

[27]Thornton Deposition, at 105.

[28]Austin Deposition, at 18.

[29]*Id.* at 22-23.

[30]*Id.* at 131-32.

[31]*Id.* at 22, 136.

little swelling" of the cheekbone and eye.[32]

From his experiences treating plaintiff at the jail throughout his incarceration, Dr. Austin formed the opinion that plaintiff was a hypochondriac, that plaintiff lied about his symptoms and medications, and that plaintiff tried to manipulate the jail staff.[33]  In fact, Dr. Austin testified that plaintiff "lied so many times about different things that I assumed that anything he said was a lie."[34]

The head nurse at the jail during the time of plaintiff's incarceration was Chapel King, who is married to defendant Phillip King.  Dr. Austin knew that Chapel King and Phillip King were married, and he knew during the time he was treating plaintiff that plaintiff had made allegations of abuse against Phillip King.[35] Additionally, nurse Annette McCurry worked with Chapel King, and saw her occasionally outside of work.  McCurry also knew that plaintiff had made allegations of abuse against Phillip King.[36]

### III. DISCUSSION

King argues that he is protected by the doctrine of qualified immunity from plaintiff's Eighth Amendment claim against him.

---

[32]*Id.* at 227-28.

[33]Austin Deposition, at 85, 93-94, 174.

[34]*Id.* at 93.

[35]*Id.* at 151-52.

[36]McCurry Deposition, at 9, 109.

The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Ordinarily, courts apply a two-part test for evaluating whether a defendant is entitled to qualified immunity. The "threshold question" that must be asked by the district court is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If the threshold question is answered positively, the court will proceed to analyze the second aspect of the two-part inquiry: *i.e.,* "whether the right was clearly established." *Id.*[37]

Here, however, the court must reach only the first part of the inquiry set forth above. "In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a

---

[37]The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it is uncontested that King was acting within his discretionary authority at the time of the events leading to plaintiff's claims.

violation of the Constitution by the Supreme Court. . . ." *Skritch v. Thornton,* 280 F.3d 1295, 1301 (11th Cir. 2002) (citing *Hudson v. McMillan,* 503 U.S. 1, 7-8 (1992); *Whitley v. Albers,* 475 U.S. 312, 320-21 (1986); *Johnson v. Breeden*, 280 F.3d 1308 (11th Cir. 2002)).   Stated slightly differently, "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." *Skritch,* 280 F.3d at 1301 (citing *Johnson,* 280 F.3d 1308).   Accordingly, the only question that must be asked is "whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or a motion for summary judgment.  If he has done so, that is the end of the inquiry." *Skritch,* 280 F.3d at 1301.

The court concludes that, in this case, if all facts are construed in the light most favorable to plaintiff, then plaintiff can survive a motion for summary judgment on his claim against King for the use of excessive force in violation of the Eighth Amendment.  The Eleventh Circuit has held that,

> [u]nder the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers,* 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir. 1973)); *see also Hudson v. McMillian,* 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).  To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any

efforts made to temper the severity of a forceful response." *Hudson,* at 7-8, 112 S. Ct. 995; *see also Whitley,* 475 U.S. at 321, 106 S. Ct. 1078; *Harris v. Chapman,* 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley,* 475 U.S. at 321, 106 S. Ct. 1078 (quoting *Johnson,* 481 F.2d at 1033).

*Skritch,* 280 F.3d at 1300-01 (bracketed alteration in original).

Applying the factors set forth above to the facts presented by plaintiff easily leads to the conclusion that King acted "maliciously and sadistically," or with a "knowing willingness" that harm would occur to plaintiff. Although plaintiff had been yelling about being placed in lockdown, and had been arguing with other inmates, there is no evidence that he demonstrated any threatening behavior toward King or any other corrections officer. Furthermore, King entered plaintiff's cell to investigate the cause of a *verbal* disagreement among inmates, not to address any physical altercation. Plaintiff made no threatening movements toward King once King entered the cell, and, in fact, he stepped several steps away from the door when King entered. Once King had entered plaintiff's cell, plaintiff again asked him why he had been placed in lockdown, but there is no evidence that plaintiff used any threatening language or gestures. According to plaintiff, King — without provocation — charged at plaintiff in a fit of rage, slammed him down on his bunk,

-12-

and beat his head against a concrete wall four to six times.  No reasonable juror could conclude that such an extreme, unprovoked use of force was necessary to further King's investigation into the verbal disagreement between inmates.

Defendant hardly contests this point, and instead argues that plaintiff's version of events — particularly the number of times plaintiff alleges that King banged his head against the wall — cannot be credited because it is inconsistent with the uncontroverted evidence of record.  Defendant relies upon the Supreme Court's decision in *Scott v. Harris,* 550 U.S. 372 (2007).  There, the Supreme Court emphasized that,

> [a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  **When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment**.

*Scott,* 550 U.S. 372, 127 S. Ct. at 1776 (second and third bracketed alterations in original) (italicized emphasis in original; boldface emphasis supplied).

In *Scott,* the Court considered whether, consistent with the Fourth Amendment, an officer could "take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders." *Id.,* 550 U.S. 372, 127 S. Ct. at 1772.  According to the testimony of the fleeing motorist (the plaintiff in *Scott*), which had been taken as true during summary proceedings in the lower courts, the plaintiff drove responsibly while he was evading capture, and he did not present any threat to pedestrians or other motorists. *Id.,* 550 U.S. 372, 127 S. Ct. at 1775.  The defendant, however, had presented a video tape of the police chase.  The tape depicted plaintiff driving "shockingly fast," swerving around other cars, crossing the double-yellow line, forcing other cars to run off the road, running red lights, and driving in the wrong lane.  *Id.,* 550 U.S. 372, 127 S. Ct. at 1775.  On appeal, the Supreme Court held that, "with regard to the factual issue whether [the plaintiff] was driving in such fashion as to endanger human life," the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him."  *Id.,* 550 U.S. 372, 127 S. Ct. at 1776. Consequently, the lower courts "should not have relied on such visible fiction; [they] should have viewed the facts in the light depicted by the videotape."  *Id.*

-14-

Here, of course, there is no videotape recording of the altercation between plaintiff and King.  Even so, several courts have extended the reach of *Scott* to excessive force cases in which the injuries claimed by the plaintiff were directly contradicted by the objective medical evidence of record.  Even though these decisions all are either unreported, or from other jurisdictions, and consequently are not binding, this court agrees with their extension of *Scott* to the evaluation of medical evidence in an excessive force case.  There is nothing in *Scott* to indicate that its holding should be limited to cases involving objective videotape evidence.

In *Skylstad v. Reynolds,* 248 Fed. Appx. 808 (9th Cir. 2007), for example, the plaintiff claimed that police officers used excessive force in arresting him.  The plaintiff testified that he "voluntarily surrendered, that the officers unnecessarily used a K-9 dog to repeatedly bite and attack him, and that the officers smashed his head against the car and cut his arms open at the scene to take his blood."  *Id.* at 811.  Although the plaintiff submitted affidavits from his wife and two other witnesses to support his version of events, the medical evidence directly contradicted his story.  *Id.*  There was evidence of a serious dog bite that required medical attention, but there was "no medical evidence of multiple dog bites, head injury, or cuts on the arms."  *Id.*  Consequently, the Ninth Circuit concluded that the plaintiff's version of events should not be credited, and held that the plaintiff "failed to raise a triable issue for a

jury on his claim of excessive force." *Id.*

In *Williams v. Martin,* No. 1:06-cv-2161-WSD, 2007 WL 4139476 (N.D. Ga. Oct. 29, 2007), the Northern District of Georgia considered an inmate's claim for excessive force based upon allegations that a jail guard kicked him in the head. The district court held that the evidence supporting the plaintiff's claim was "exceptionally weak," and that "no reasonable juror could believe" that the defendant police officer had used excessive force on the plaintiff. *Id.* at *6, *8. For example, the plaintiff testified that he did not know for sure that the defendant officer had kicked him in the face, and the medical evidence did not show injuries "of the magnitude expected from heavy kicks to the face by booted feet." *Id.* at *8. Accordingly, the plaintiff's excessive force claim against the officer failed as a matter of law. *Id.*

Finally, in *Kelley v. Owens,* No. 2:05cv1150-MHT, 2008 WL 313108 (M.D. Ala. Feb. 1, 2008), the plaintiff alleged that a jail guard attacked him, breaking two of his teeth and cracking a third. *Id.* at *8. However, the dentist who examined the plaintiff did not find any broken teeth or other evidence of trauma, and he only treated the plaintiff for tooth decay. *Id.* Applying the Supreme Court's *Scott* decision, the Middle District of Alabama held that the medical evidence so directly contradicted the plaintiff's testimony about the extent of his injuries that no reasonable jury could

-16-

believe the plaintiff's version of events.  *Id.* at *8.

However, the medical evidence in the present case does not contradict plaintiff's testimony as directly as in the cases cited by defendant.  Plaintiff testified that, after the altercation with King, a knot formed on his head, and he developed a bad headache.  He began to experience nosebleeds for the first time ever; he complained of double vision; and he experienced tenderness and swelling in his cheekbone and eye.  A reasonable jury could conclude that these injuries resulted from plaintiff's head being banged against a wall.

The court's conclusion is not affected by certain record evidence that, as defendant points out, is unfavorable to plaintiff.  For example, plaintiff had a history of headaches and double vision before the altercation with King.[38]  Even so, a reasonable juror could conclude that plaintiff suffered *additional* symptoms as a result of the injuries he received on March 11, 2005, or that his pre-existing symptoms were exacerbated by his injuries.  Defendant also suggests that because plaintiff's CAT scans and eye exams were normal, there is no medical evidence to support plaintiff's complaints of double vision.  Defendant urges that double vision will "typically" be accompanied by an abnormal CAT scan, and that "if a CAT scan

---

[38]*See* Austin Deposition, at 106-07, 159-60.

is normal, doctors *may assume* that double vision is not present."[39]   Defendant is

unable, however, to produce definitive evidence that double vision is *always*

accompanied by an abnormal CAT scan or eye exam.   In fact, Dr. Austin

acknowledged in his deposition that there are no definitive medical tests for double

vision, and that doctors typically rely upon a patient's subjective complaints to

diagnose the condition.   Defendant also asserts that plaintiff's head injury was not

serious because his CAT scans were normal, and because he had only a single small

bruise on the back of his head.   However, Dr. Austin noted the "single small bruise"

when he examined plaintiff *three days* after the incident.   Presumably, the bruising

and swelling on the back of plaintiff's head would have diminished at least somehwat

by that point.   Plaintiff testified that he had a large knot on his head after the incident,

and that corrections officer Jim Williams acknowledged feeling the knot.   While

Williams and nurse Annette McCurry both deny the existence of a *large* knot on

plaintiff's head, there is no objective evidence to support their testimony.   Instead, it

is simply their testimony against plaintiff's.   Finally, defendant asserts that the

medical evidence refutes plaintiff's allegation that his nosebleeds were caused by his

head injuries.   Much was made during Dr. Austin's deposition about the medical

causes of different kinds of nosebleeds.   Ultimately, however, Dr. Austin stated that

---

[39]Doc. no. 42 (defendant's reply brief), at 2 (emphasis supplied).

it was not impossible for a nosebleed to result from injuries to the back of a patient's head.  He also testified that a nosebleed could result from facial trauma, or from elevated blood pressure.  While it is clear that Dr. Austin found it highly unlikely that the injuries plaintiff allegedly received during his altercation with King caused his nose to bleed, Dr. Austin's testimony does establish that such a result would be impossible.

In short, all the "holes" defendant has found in plaintiff's evidence merely demonstrate the existence of genuine issues of material fact with regard to the cause and extent of plaintiff's injuries.  Defendant will be free at trial to attack plaintiff's credibility, to point out inconsistencies in his testimony, and to question the weight of his evidence, but it would be improper for the court to consider those challenges at this stage.[40]  For summary judgment purposes, plaintiff's testimony is neither blatantly nor directly contradicted by the record, such that no reasonable jury could believe his version of events.  Plaintiff has produced sufficient evidence for a reasonable jury to conclude that defendant violated the Eighth Amendment by applying excessive force to plaintiff.  Accordingly, defendant's motion for summary judgment is due to be denied.

---

[40]Likewise, plaintiff will be free to challenge the credibility of his in-jail medical providers by pointing out that Dr. Austin was predisposed to believe that plaintiff was lying, and that both Dr. Austin and Nurse McCurry had a close working relationship with the wife of plaintiff's alleged attacker.

## IV. CONCLUSION AND ORDER

The court finds genuine issues of material fact precluding the entry of summary judgment.  Accordingly, defendant's motion for summary judgment is DENIED.  The case will be set for pretrial conference and jury trial by subsequent notice.

DONE this 15th day of January, 2009.

_____

United States District Judge